**TRADERS & GENERAL INS. CO. v. MILLS.**

**No. 3155.**

Court of Civil Appeals of Texas. Beaumont.

July 28, 1937.

Rehearing Denied Aug. 4, 1937.

Lightfoot, Robertson, Saunders & Gano, of Ft. Worth, and Collins & Collins, of Lufkin, for appellant.

Effie Harper, of Conroe, and Ewing Werlein, of Houston, for appellee.

WALKER, Chief Justice.

This is a compensation case with Conroe Lumber Company, the employer; appellant, Traders & General Insurance Company, the compensation insurance carrier; Abe Mills, deceased, the employee; and appellee, Nella Mills, surviving widow of Abe Mills, the compensation claimant. On the verdict of the jury, judgment was entered against appellant and in favor of appellee for the lump sum of $2,460.39.

■ The award of the Industrial Accident Board was against appellee. Appellant's first point is that the record does not show that she filed her original petition by way of appeal from the award of the Industrial Accident Board within the time allowed by law. The transcript did not contain the original petition and there was nothing in the record to show when it was filed. We granted appellee's motion for writ of certiorari to bring up the original petition; the file mark thereon shows that it was timely filed. This action by us is supported by American Fidelity & Casualty Co. v. Bradley (Tex.Civ.App.) 70 S.W.(2d) 645.

■ There is no merit in the contention that the file mark on the original petition could be shown only by the statement of facts—that it was appellee's duty to offer in evidence the file mark on the original petition. In the absence of evidence to the contrary, we would assume that the lower court took judicial notice of the date the original petition was filed, and in support of its jurisdiction determined that it was timely filed. Humphreys v. Young (Tex.Civ.App.) 293 S.W. 655; Askey v. Power (Tex.Com.App.) 36 S.W.(2d) 446; Liberty Life Ins. Co. v. Moore (Tex.Civ. App.) 10 S.W.(2d) 178.

■ Harry Hawthorne was Abe Mills' fellow employee. In an altercation between them on the 7th day of March, 1936, Hawthorne struck Mills on the head with a large piece of timber; Mills died the next day. The jury found that the altercation grew out of the work of their employer; that at the time Hawthorne struck him Mills was "within the course of his employment with Conroe Lumber Corporation"; and that the injury inflicted upon Mills by Hawthorne was the producing cause of Mills' death. The jury further found that the injury to Mills was not caused by his "wilful intention and attempt to injure Hawthorne"; the jury gave an affirmative answer to question No. 4: "Do you find from a preponderance of the evidence that the injury sustained by Abe Mills was not caused by the act of Harry Hawthorne intended to injure him because of reasons personal to said Abe Mills and not directed against him as an employee or because of the employment?"

Appellant's second point is that these findings of the jury are without support in the evidence, and are so against the great weight and preponderance of the evidence as to be clearly wrong. This contention is overruled; the evidence fully supports the findings of the jury. The controversy between Mills and Hawthorne on the morning of the 7th of March grew out of the difference between them regarding the manner Hawthorne was performing his work. Mills had been in the employment of the Conroe Lumber Corporation since about 1920, and Hawthorne for eight or ten years. There was never a dispute between them over any personal matter. They worked together under the sawmill shed, five or eight feet apart, Hawthorne in the "bear pit," and Mills handling the lumber after it had passed Hawthorne. There was no personal contact between them except as it grew out of their employment. When Hawthorne neglected his work, the lumber or slabs, "piled up," and Mills was compelled to cross over and do the work Hawthorne should have done. Because of Hawthorne's failure from time to time to do his work in the proper manner, Mills had become bitter towards him and aggressively tried to show him how to do his work. Hawthorne resented this interference by Mills. While in fact Mills had no authority over Hawthorne and the other hands under the millshed, he assumed authority and, in the absence of the foreman, acted as a sort of straw boss. On the morning of the 7th Hawthorne was neglecting his work. By certain signs—the noise was so great they could not talk—Mills tried to make Hawthorne take care of his lumber and slabs; Mills did this several times. Hawthorne, in reply, thumbed his nose at Mills, but did not take care of his work. Mills became enraged at him, climbed down into the "bear pit," and struck him with a stick. Hawthorne jumped out of the pit and ran off. Mills returned to his work and Hawthorne returned to his pit. About fifteen minutes later, when Mills' back was to Hawthorne and while he was actively doing his work, Hawthorne climbed out of his pit, slipped up behind Mills, and struck him on the head with a large piece of timber. Mills died the next day.

We quote as follows from the testimony of the witnesses, questions and answers reduced to narrative:

Marshall Majors testified that, on the morning of the 7th, Mills told Hawthorne "to keep the slab strips so they would not ball his work up"; because of the noise this witness could not hear what Mills said, but he could read and understand the signs made by Mills to Hawthorne; Hawthorne thumbed his nose at Mills in reply; Mills gave these signs many times that morning.

"At the time Harry Hawthorne was slowing down with the work; when he slowed down with the work the job got balled up. That was when Abe Mills made this motion with his hands I spoke of toward the lumber; it was getting balled up at that time when Abe Mills did that. Harry Hawthorne had slowed down on the job at other times besides this time. Abe Mills at other times gave him motions with respect to the way he was doing his work. The effect of these motions was to tell him to keep the slab and strips off there; keep the slabs off the roller. After Abe Mills did that Harry Hawthorne slowed down continuously. The board that he hit Abe with was there by him on the rollers, it passed by him; passed by Harry. He cut him one. When he got the board he was farther away from Abe Mills at that time than from me to you. Then Harry Hawthorne just hit him; behind. At that time Abe Mills did not know or couldn't see that Harry Hawthorne was coming behind him. Abe Mills used his hands a number of times to get Harry Hawthorne to do the work quicker or better. * * *

"It appeared to me he got kind of angry. He appeared to be angry about what Mills was doing. Abe Mills had charge of that work, supervision, right at that time; he was supposed to be looking after it. There was no one else there at that time that had supervision over the employes there. Abe Mills would customarily undertake to do the work, undertake to direct the work over him when there was no white foreman there; that was his job, for him to tell him. In giving these motions and directions he was doing his job; his work. * * *

"By him making signs, I knowed what he was talking about. He was moving his lips. I was looking at Abe Mills. I didn't 'thought' that was it, I knowed that was it. I could stand off out there and watch Abe's sign, and knew some of what was in his mind. I knew the signs. They would have known what I would have meant if I had given these signs."

The witness Luther Booker testified that, at the time of the altercation between Mills and Hawthorne, the strips, or pieces, of lumber which it was Hawthorne's duty to handle were jammed; and further:

"One was across the other one, but it was just like if I had something to raise up and it won't slip, and when you raise that strip up there is another strip right that way, and a strip come down this way and get all tangled up, and Abe went around there to throw these strips off and that is when he hit him; he (Mills) went and throwed the strips off and then hit him. * * *

"It seems a matter of getting these strips off of there would interfere with Abe and would interfere with others too. I don't know what the disagreement was about. As a general proposition that was a matter that kind of kept us all stirred up about that work. * * * I said it was about ten minutes from the time that Abe hit Harry with the stick until I saw Abe lying out there on the floor. * * * When Abe went over there a number of times to straighten out that lumber that Harry had let jam, he appeared to be a little angry or mad about it; and the oftener it jammed the oftener he would go. That was his job to go. It was Harry's job to pull the strips if they jammed up on him. That was his place to pull them out and keep them pulled out; that would assist in keeping them from jamming some of the time. * * *

"Harry went back to work and Abe turned this way; I looked and seen him— and went back to see about his work. It was some five or ten minutes before I said Harry hit him. With reference to the place where he worked and where Harry worked, Abe Mills was laying behind the two places. Abe was working on the hole trimmer table to take care of all of this lumber that gets crossed up; that is where he had to take care of it; he was laying out in the place where his work was."

The witness Vernon Britton, called by appellant, testified that he saw a difficulty at the sawmill the morning of the killing when "Harry was tumbling out of the bear hole and Abe walked around with a stick and struck Harry and turned around to strike him again, but did not strike him the second time." He further testified that Harry didn't do anything at the time, and that Abe turned around and went back to his place of work and that the witness went back to work; that Harry went back to his work and in about fifteen minutes "I saw Abe laying there behind the leather booger unconscious." The witness said he did not know what the difficulty was about, and that nothing was in the hands of Mills after the witness went to pick him up. He testified further:

"It was about fifteen minutes between the time I saw Mills strike Harry Hawthorne before Abe Mills was unconscious, before I saw him unconscious. They did not have any fight during that fifteen minutes there. Whenever Harry Hawthorne would fall down on his job and didn't work right, whenever he would not trip and the lumber would get all balled up, Abe would go up there and tell him about doing his work; he would have to do that. * * *

"Abe and Harry would be working with the lumber, throwing strips off; when Harry did not pull them off right they would pile up and Abe would have to go up there sometimes to see about it. He would have to go up there because, if the slabs were piled up and they do not come down the rollers, the strips will pile up and do not go on down the rollers; Harry could not help it sometimes and it would pile up on him any way. * * *

"If Harry let that lumber pile up there Abe would have to go up there. * * *

"Every time that Harry would fail to bring out that lumber and pile it in the proper place Abe would have to do it for him. * * *

"I don't know how many times Abe Mills had to go up there to that place where the lumber was jammed up. I don't know whether he had to go a number of times; he had to go about fifteen feet where he went, I guess. Then he would have to go back and straighten the stuff out. There was some lumber hooks around there; I didn't see any about Mills when he was on the ground. * * *

"Abe looked like he was angry when he went up there to get that lumber off the slab. I don't know whether he got angry because he had to go up there and get that lumber off; I guess so. I don't know what he was angry about. If Harry had taken the lumber off of the slab Abe would not have had to pull it out; sometimes the bear fighter could not help them. * * *

"Sometimes the slabs would jam up behind him, or jam up on him."

The witness Jim Turner, called by appellant, testified that, on Thursday before the assault, he saw Abe Mills get in the hole where Harry Hawthorne was working and "sort of push him around with his fist"; that was the only time he saw Mills strike Hawthorne.

On the testimony, as summarized above, Travelers' Ins. Co. v. Culpepper, 82 S.W. (2d) 1054, 1056, by this court, directly supports the jury's verdict finding that Mills was killed in the course of his employment. In that case the fight grew out of a dispute over a lead pencil used in the employer's business. Speaking for this court, Judge Combs said: "But in the case before us the facts clearly distinguish it from those cases where our courts have denied recovery on the ground that the employee, at the time of his injury, had turned aside from his employment. Here the difficulty arose between two fellow employees over the method or manner of doing the work and at a time when they were engaged in the service of the common employer. Thus the injury originated in the work or business of the master, or in furtherance of its affairs. Boyd's anger toward Culpepper was directed toward him because of acts performed in his capacity as an employee. And the finding is amply supported that Culpepper was not, at the time of his injury, engaged in a willful intention or attempt to injure Boyd. Under all of the authorities an injury so received is compensable. Article 8309, Vernon's Ann.Civ. St.; McClure v. Georgia Casualty Co. (Tex.Com.App.) 251 S.W. 800; New Amsterdam Casualty Co. v. Collins (Tex.Civ. App.) 289 S.W. 701, 702; Cassell v. United States Fidelity & Guaranty Co., 115 Tex. 371, 283 S.W. 127, 46 A.L.R. 1137."

The facts of McClure v. Georgia Casualty Company (Tex.Com.App.) 251 S.W. 800, 802, are interestingly in point. In that case the Commission of Appéals said:

"The Workmen's Compensation Act is a remedial statute intended to give relief in the form of compensation for injuries sustained by employees in industrial pursuits, irrespective of the existence of a common-law right of action for damages, and its provisions should be liberally construed with a view to accomplish its purpose and to promote justice. Lumberman's Reciprocal Association v. Behnken [112 Tex. 103] 246 S.W. 72, 74, [28 A.L.R. 1402]. If the assault which inflicted the injury received by plaintiff in error had to do with or originated in the work he was doing for his employer, such assault was directed against him as an employee or because of his employment, notwithstanding the fact that Ed Hodge, who made such assault, intended to injure him because he thought he was about to use a knife in the fight in progress. Our own Supreme Court, in Lumberman's Reciprocal Association v. Behnken, supra, says:

"'An injury has to do with, and arises out of, the work or business of the employer, when it results from a risk or hazard which is necessarily or ordinarily or reasonably inherent in or incident to the conduct of such work or business. As tersely put by the Supreme Court of Iowa: "What the law intends is to protect the employee against the risk or hazard taken in order to perform the master's task." Pace v. Appanoose County, 184 Iowa, 498, 168 N.W. [916] 918.'"

Judge O'Quinn, speaking for this court in Consolidated Underwriters v. Saxon, 250 S.W. 447, 450, said:

"So it is seen that Saxon, at the time of receiving the injuries from which he died, was on the premises of and engaged in the business of his master. But for the employment he would not have been at the place of injury, and would not have been exposed to the danger. The employment was at least a contributing proximate cause —a hazard to which he would not have been equally exposed apart from the employment. His presence at the place of injury was solely for and in the interest of his master's business. The trouble

originated in and arose out of and about the master's business, and not out of personal matters of either Saxon or Johnson (subdivision 4, art. 5246-82, Vernon's Ann. Civ.St.Supp.1918); there was not, nor had there been, any personal grudge between them. In our compensation statute (article 5246-1) the expression 'in the course of his employment' has reference to the time, place, and circumstances under which the injury occurred. Phil Hollenbach Co. v. Hollenbach, 181 Ky. 262, 204 S.W. 152, 13 A.L.R. 524; Lumbermen's Reciprocal Association v. Behnken (Tex.Civ.App.) 226 S.W. 154. Our statute is more liberal than the compensation statutes of many states. It does not require that the injury shall 'arise out of the employment.' "

On the authorities cited it is our conclusion that the evidence fully supports the verdict of the jury as summarized above on this point.

■ The court did not err in refusing to submit appellee's specially requested issue, asking the jury to find whether or not Mills provoked the difficulty, for the reason that, on the undisputed evidence, the difficulty grew out of the performance by Hawthorne and Mills of the duties of their employment; on the facts of this case it was immaterial as to which one of them was the aggressor.

■ Appellant assigns error on the refusal of the court to submit the following issues:

"Do you find from the evidence that deceased, Abe Mills, was attempting to wrongfully injure or assault Harry Hawthorne at the time deceased Abe Mills suffered his fatal injury? Answer Yes or No."

"Do you find from the evidence that at the time Harry Hawthorne struck deceased, if he did, that he did so in the necessary protection of his own person from serious bodily harm or death at the hands of the deceased, Abe Mills, at the time in question, when viewed from the standpoint of Harry Hawthorne, in the light of all the surrounding circumstances? Answer Yes or No."

"Do you find from the evidence that Harry Hawthorne was acting in self defense at the time he struck and killed the deceased, Abe Mills, if he did? Answer Yes or No."

These defensive issues were not raised by the evidence. Hawthorne struck Mills some fifteen minutes after Mills had assaulted him in the "bear pit," and at a time when Mills was not molesting him but was actually engaged in the performance of the duties of his employment, and when Mills was not attempting to harm or injure him, and when it was not necessary for him to strike Mills "in the necessary protection of his own person." Under all the evidence, Hawthorne was not acting in self-defense when he inflicted the fatal blow upon Mills.

■■ The court did not err in refusing to define the terms "injury" and "accidental personal injury." The facts on these issues were undisputed; the injury inflicted upon Mills by Hawthorne, as a matter of law, harmed and damaged the physical structure of his body. No definitions of these terms could have aided the jury, in answering the questions submitted by the court's charge. A definition of legal terms is not required where there is no controversy as to the facts of the injury, and that it harmed and damaged the physical structure of the body, or produced the death or the incapacity in issue. On this point we quote as follows from 41 Tex.Jur. 1158:

" 'Reasonable Necessity' as Test.—Not all legal terms used in submitting issues need be defined in every case. It is only when, under the facts presented, definitions are necessary to enable the jury properly to pass upon the questions and render a verdict upon the issues submitted that they are required (R.S. art. 2189).

"In the nature of things, the statute has not attempted to declare what 'legal terms' shall be explained or defined further than 'shall be necessary to enable the jury to properly pass upon and render a verdict on such issues.' Reasonable necessity, considering the term or terms used, then, should be the test. * * *

"Again, the undisputed testimony may render it unnecessary to define some legal terms. And a term which at times should be defined may, in view of the context of the issue, convey its meaning without explanation. Furthermore, when the evidence clearly discloses the meaning of a term it need not be defined."

Speaking for this court in Fidelity & Casualty Co. v. Branton, 70 S.W.(2d) 780, 783, Mr. Justice O'Quinn said: "It appearing without dispute that plaintiff was injured, it was not necessary to define the word 'injury,' or to submit an issue as to

whether he received an injury, or as to whether he received an accidental injury in the course of his employment. It is well settled that undisputed facts should not be submitted to a jury for their finding. It is only where facts are in dispute that their submission to a jury is proper. Federal Surety Co. v. Smith (Tex.Com.App.) 41 S.W.(2d) 210; Berryman v. Norfleet (Tex.Civ.App.) 41 S.W.(2d) 722 (writ refused); Royalty Indemnity Co. v. Madrigal (Tex.Civ.App.) 14 S.W.(2d) 106; Texas Employers' Ins. Ass'n v. Russell (Tex. Civ.App.) 16 S.W.(2d) 321; Security Union Ins. Co. v. Hall (Tex.Civ.App.) 37 S.W.(2d) 811; Daniels v. Starnes (Tex. Civ.App.) 61 S.W.(2d) 548."

On the facts of this case—no controversy in the evidence as to the nature of the injury and that it caused Mills' death—the cases cited by appellant are not in point. Thus, in Traders & General Ins. Co. v. Hicks (Tex.Civ.App.) 94 S.W.(2d) 824, 825, the court held that the word "injury" should have been defined because "the evidence was sharply conflicting as to whether appellee received a compensable injury as defined by the statute." In American Fidelity & Casualty Co. v. Bradley, supra, there was a serious conflict as to whether or not the injury to appellee's knee in 1924 was the proximate cause of the injuries and incapacity upon which the action was based.

■ We overrule the assignment that the court erred in refusing to define the term "substantially the whole of the year," as used in the charge submitting the issues of average weekly wage. On these issues there was no conflict in the testimony; under all the evidence Mills did not work for the Conroe Lumber Corporation substantially "the whole of the year" that he was injured; the sawmill operated only about 200 days during that year. The proof also showed that the other sawmills around and near Conroe did not operate substantially the whole of that year. The jury answered these issues in the negative; on the undisputed testimony, regardless of any definition the court might have given, the jury would have been compelled to give negative answers to these questions.

The jury answered "$14.40" to the question: "What sum of money, if any, do you find from a preponderance of the evidence to be the average weekly wage of Abe Mills, which to you may seem just and fair to both parties, plaintiff and defendant?"

This answer was based upon undisputed testimony; J. S. Patton, cashier of the Conroe Lumber Corporation, testified that $2.40, the daily wage paid Mills at the time he was killed, was the rate of compensation received by employees of his class at the mill of Conroe Lumber Corporation, and also at all other mills in the vicinity of Conroe, doing the same class of work. He testified: "Well, I don't know that I know whether it is fair or not. I would say this. He was receiving the same wages as other places doing a like or similar work to our operation."

There was testimony that one mill, about seven miles from the mill of the Conroe Lumber Corporation, paid only $2 per day, but it was not shown that this $2 work was similar to the work Mills was doing.

■ The court did not err in permitting the witness Marshall Majors to give his interpretation of the "signs" that Mills made to Hawthorne on the morning of their trouble. That the employees of the mill had "a sign language" which they understood was undisputed; that fact was well known to the employees of the mill and they understood this sign language. In addition to the facts reflected above by the testimony of Majors as to this sign language, Mr. Castleman, the mill superintendent, testified that the mill hands had "some kind of sign language around there among themselves." Majors was not giving his "conclusions" relative to the meaning of the sign language, but was testifying to facts known to him and to the recognized meaning of the sign language.

■ In defining the term "injuries sustained in the course of his employment," the court gave the statutory definition of that term, but did not charge the jury that "the term 'injury sustained in the course of employment,'" as used in the charge, "shall not include an injury caused by an act of a third person intended to injure the employee because of reasons personal to him and not directed against him as an employee, or because of his employment," as requested by appellant. This omission was not error because the facts omitted from the definition were not in evidence; under all the evidence Mills was killed while working for his master "within the course of his employment"; and under all the evidence Hawthorne did not injure Mills because of reasons personal to him but for reasons directed against him as an em-

ployee and because of his employment, and for reasons growing out of his employment.

For the reasons stated, the judgment of the lower court should be in all things affirmed, and it is accordingly so ordered.

Affirmed.