Brigida L. RIVAS, Appellant,

v.

UNITED STATES FIRE INSURANCE
COMPANY, Appellee.

No. 623.

Court of Civil Appeals of Texas,
Corpus Christi.

July 29, 1971.

Rehearing Denied Sept. 9, 1971.

Carl H. Judin, Jr., Thomas P. Earls,
McAllen, for appellant.

Atlas, Hall, Schwarz, Mills, Gurwitz &
Bland, Asa V. Bland, McAllen, for appellee.

## OPINION

SHARPE, Justice.

This appeal is from a judgment rendered
after jury trial in a workmen's compensation
case that Brigida L. Rivas, appellant,
widow of Nicolas Beltran Rivas, take nothing
against United States Fire Insurance
Company, appellee.

Appellant's claim arose out of the death
of her husband who on May 25, 1969 in
Hidalgo County, Texas, sustained an accidental
injury in the course of his employment
for the LaMantia-Cullum-Collier &
Co., Inc., for which company appellee was
workmen's compensation insurance carrier.
The Industrial Accident Board made an
award in favor of appellant from which
appellee appealed. Appellant answered and
counterclaimed for death benefits under the
workmen's compensation law. In the district
court the parties stipulated, among
other things, that on May 25, 1969, Mr.
Rivas sustained an accidental injury within
the course and scope of his employment
with the said LaMantia-Cullum-Collier &
Co., Inc. The single special issue sub-

mitted to the jury inquired whether the injuries sustained by Mr. Rivas on May 25, 1969, were a producing cause of his death on August 1, 1969. The jury answered "No" to that inquiry.

Appellant asserts two points of error, as follows:

"I.

The District Court erred in failing to grant Appellant a new Trial, in that the finding of the jury in response to Special Issue No. 1 is against the great weight and preponderance of the evidence.

II.

The District Court erred in refusing the requested definition of the Defendant and Cross-Plaintiff, Brigida L. Rivas, which definition requested the Court to instruct the Jury as follows: 'You are instructed that the term "injuries" as used in this charge, shall be considered to mean damage or harm to the physical structure of the body and such diseases and infections as naturally result therefrom, or the excitement, acceleration, or aggravation of any disease previously existing by reason of such damage or harm to the body.' "

The evidence reflects that Mr. Rivas was admitted to the Knapp Memorial Hospital in Weslaco, Texas at about 2:30 P.M. on May 25, 1969 and he remained there until his death on August 1, 1969. During that period of time he was treated by Dr. Armando Cuellar, Dr. Don P. Warden and Dr. Gonzalo Caballero, all of whom testified on the trial of the case.

Dr. Cuellar is a medical doctor engaged in the general practice of medicine. He was the first doctor who saw Mr. Rivas on May 25, 1969 and treated him thereafter except for two periods of time until Mr. Rivas' death. X-rays reflected that Rivas had sustained a non-displaced fracture in the pelvis region and a non-displaced fracture of the skull. About three

days after admission Mr. Rivas appeared jaundiced. Dr. Cuellar then arranged for Dr. Don P. Warden, who practices internal medicine, to examine Rivas and make a report. Thereafter, on July 22, 1969, Dr. Gonzalo Caballero, a medical doctor specializing in general surgery, was consulted. On July 23, 1969, Dr. Caballero performed exploratory surgery on Rivas. The testimony of the three doctors, above-mentioned, will be discussed in the order in which they testified.

Dr. Don P. Warden testified substantially as follows: He examined Mr. Rivas at the request of Dr. Cuellar after Rivas had been in the hospital about three days. Rivas had multiple injuries, including a probable fracture of the skull and a fractured bone in the pelvis. The most obvious physical finding he observed was that Rivas was deeply jaundiced. Rivas also had a distended gall bladder. Jaundiced means a yellowish tint to the skin and mucous membranes due to the retention of a high level of a substance called bilirubin. Rivas was free of complaints of pain when Dr. Warden examined him. The doctor conducted a routine examination to determine the cause of the jaundice. With regard to the liver Doctor Warden said that Rivas' gall bladder was distended and it is closely related to the liver and frequently is the cause of jaundice. Dr. Warden felt that Rivas was suffering from an obstructive jaundice. He explained that the liver produces bile which is then concentrated by the gall bladder and subsequently flows into the duodenum to serve its function in the digestion of food. If the bile duct is pinched off between its point of origin in the liver and where it empties into the gall bladder the bile cannot get out of the liver and it then flows back into the blood, causing jaundice. The amount of jaundice Mr. Rivas had in his blood indicated a rather serious degree of decomposition or weakness in the liver. Dr. Warden expressed his opinion concerning the relationship between Rivas' fall and his development of jaundice by saying: "Well, it is

my opinion that the patient became jaundiced at the time of or following the fall because of a load or stress placed on the liver by the damage of the tissues of the body as a result of the fall, and subsequently, because of the liver's function in healing the entire body and regulation of the clotting of the blood, this strain caused the liver to decompensate and he became jaundiced." Dr. Warden said that Rivas had gone through a period of shock after the fall but was totally out of this when the doctor first saw him on June 2, 1969. In the doctor's opinion the fall produced the shock and also a tremendous strain on Rivas' liver. Doctor Warden saw Rivas again on June 3rd and 4th, and then thought Rivas had a definite obstruction to the flow of bile out of the liver. The doctor saw Rivas again on June 14th. At that time the jaundice had cleared considerably. The first bilirubin count had been about twelve on a scale of one as normal. On June 14th the level was down to about two and a half to three and a half. The doctor was asked to evaluate Rivas for surgery. He said that their hand was pretty well forced because of the possibility of a malignancy in the pancreas, and they were not certain they didn't have a stone in the common duct which was correctable surgically. The doctor left town on vacation and did not see Rivas again. In taking the history of the patient, Dr. Warden said that in a liver situation of this nature inquiry is made concerning the use of alcohol to excess. When Rivas was questioned regarding this, he denied it. However, all of the doctors thereafter testified that Rivas had a history of having been for a period of time an excessive drinker. Dr. Warden then decribed the process whereby the liver becomes cirrhosised which means "scarred". Alcohol has a direct metabolic effect on the liver cells together with the non-nourishment which people using excessive alcohol undergo. Dr. Warden further said that in his opinion Rivas had not sustained any traumatic damage to his liver. It was noted in the remarks of Dr. Cuellar in the hospital records that the deceased had a definite odor to his breath suggestive of alcohol. Dr. Warden described this odor with reference to a liver problem and stated that the odor was from a malfunctioning liver. It is caused by the inability of the liver to burn up the ammonia in the blood and when this odor occurs, it means that the ammonia content has gone up to such an extent that, Dr. Warden said "school is out." This type of odor was noted on admission to the hospital of the deceased. Further, Dr. Warden testified that an odor of this nature is one of the last vital signs. Dr. Warden further testified that after talking to Dr. Cuellar regarding the amount of drinking that the patient had done in the past he changed his impression concerning the condition of the liver. Further, on cross-examination Dr. Warden stated that he felt Rivas had gall stones (which was confirmed by the later operation) and that the formation of gall stones has no relation to trauma. When asked why Rivas' bilirubin count was so much higher than it was supposed to be, the doctor testified that the bilirubin was up because he had cirrhosis of the liver. He further said that if Rivas had been examined prior to the accident he would then have had an abnormally high bilirubin count. Also, his alkaline count would likewise have been high prior to the accident in question. The bilirubin count was brought down substantially during the patient's hospitalization and this was attributed by Dr. Warden to bed rest, vitamins, proper care and no toxicants. He testified that surgery was necessary because of the blockage which was continually suspected either because of gall stones or because of a malignancy in the pancreas and that the doctors felt that the patient could withstand the operation. The operation on July 22, 1969, verified that Rivas had cirrhosis of the liver. Rivas' condition improved for a while following the surgery but then he lapsed into the hepatic coma which caused his death on August 1st. Dr. Warden also gave testimony concerning the connection between the injuries originally sustained and the ultimate death of Rivas.

The doctor at that point testified as to the various symptoms which would accompany a liver that is decompensating. He stated that he did not know what shape Rivas' liver was in at the moment before he fell. And then, when asked the question "Then you don't know whether or not the fall that he sustained either shortened or prolonged his life expectancy, do you?" he replied, "No, sir." Then also he was asked whether it was possible that the treatment Rivas received in the hospital prolonged his life expectancy and he answered, "Yes, I think it did." Further, he stated he did not know what the man's life expectancy would have been if he had never sustained the fall. The doctor said that the gall bladder operation which Rivas underwent was a tremendous trauma to his system. Following this, Dr. Warden testified that apparently Rivas had enough liver cells functioning to be compatible with life until August 1, 1969 when the hepatic coma took his life. He was asked whether or not any permanent damage was sustained to the liver as a result of the injury, to which he replied, "No, no permanent damage from an acute injury." On redirect examination the doctor further testified that he could not answer what effect the fall had upon the man's mortality. Also, after he testified that he did not know how fast the bilirubin rate had risen in Mr. Rivas' bloodstream and he did not know the level prior to the accident, he was then asked, "So we are speculating if we go further?" to which he replied, "Yes, I think I would agree with that." He also testified that he could not answer whether the condition of Rivas' liver was restored to a healthier state at some point in his hospitalization than that just before he fell. Dr. Warden also testified that he did not believe there was any direct injury to the liver in the fall. He then testified that liver damage of the type which Rivas had sustained occurs slowly over many, many years, "the wearing away of a rock by water, this type of damage which occurs in cirrhosis." He then further summarized his testimony in this manner: he was asked, "Do you know whether or not the liver repaired itself and came back during his hospitalization to the same function that it was at the time of the fall?" Answer: "No sir, it could have been as good after the fall as it was before, or it could have been much worse." Question: "That is an indeterminable thing, isn't it, doctor?" Answer: "Yes sir."

Dr. Gonzalo Caballero next testified for appellant. He examined Mr. Rivas on July 22, 1969 and performed exploratory surgery on July 23, 1969. He observed that a stone was lodged in the cystic duct of the gall bladder. He testified that perhaps a mucoid substance was responsible for the obstructive jaundice; but his opinion was that the liver was responsible for the jaundice. He believed that if the stone had been free in the gall bladder prior to the fall, that the fall may have contributed to its lodging in the cystic duct. Dr. Caballero gave his opinion that the accident of May 25, 1969 was probably a contributory factor in Mr. Rivas' death, and he explained the basis of that opinion. He testified also that he was the doctor who signed the death certificate of Mr. Rivas. The death certificate, Section 18, Part I, relates to "Cause of Death." Line (a) relates to Immediate cause. Lines (b) and (c) relate to "Conditions, if any, which gave rise to above cause (a) stating the underlying cause last." Lines (b) and (c) (directly under the line designated "Immediate cause (a)" are each preceded by the words "Due to." In this case the line designated "Immediate cause (a)" was filled in to read "Heart failure and bronchopneumonia." The line designated "Due to (b)" was filled in to read "Hepatic coma due to ceroses (sic) of liver." Line "Due to (c)" was not filled in. Section 18, Part II of the death certificate relates to "Other significant conditions contributing to death but not related to the terminal disease condition given in Part I (a)." This was not filled in by Dr. Caballero. Sections 20a through 20f of the death certificate relate to the subjects of accident or injury as follows: 20a—Accident—Suicide—Homicide; 20b—describe how in-

jury occurred (enter nature of injury in Part I or Part II of Item 18); 20c—Time of injury; 20d—Injury occurred "while at work" or "not while at work."; 20e—Place of injury; 20f—City, Town or Location, County, State. There was no information supplied under those sections—20a through 20f. Dr. Caballero, when asked about not filling in the "third area" of the death certificate, testified that: "Usually the death certificate doesn't require you to fill in all of the contributory factors, but just the most important ones."

Dr. Caballero's narrative report covering the entire surgery was in evidence. In summary, his findings were that the liver was granular, like eggnog, characteristic of cirrhosis. He also found a stone in the cystic duct and sand-like granular structures in the common duct. As indicated in his report, the granular structures in the common duct may very well have been what was causing the jaundice. Dr. Caballero further confirmed that the nurses' notes which are in the hospital records are replete for days with references like "no complaints", "slept well", "good appetite." He further testified that he did not know the condition of Mr. Rivas' liver before he fell and that he had no way of knowing whether the fall caused any permanent damage to his liver. He was asked whether he could say that the fall contributed to the death if he didn't know the shape of the liver before the fall. He answered that he didn't know how to answer that because after he saw the patient he had a pretty good idea of what he had. He further testified that he knew what Rivas had as a result of opening him up in the operating room on July 23rd and that he didn't know anything about his liver condition prior to that. He also testified that the reason cirrhosis is terminable is because the liver is no longer able to metabolize toxic materials out of the bloodstream. He testified "the liver, like you say, does not metabolize any more, and you have toxics, and not only the heart but everything else deteriorates."

Dr. Armando Cuellar next testified for appellant. Dr. Cuellar testified that he saw Mr. Rivas shortly after he was brought to the hospital, and that he appeared to be in good nutrition and showed no evidence of illness or jaundice. X-rays showed that Mr. Rivas had sustained a fractured skull and pelvis. Approximately three days after admission, Mr. Rivas appeared jaundiced. Jaundice can be caused by the absorption of blood into the system and can also be precipitated by a head injury or shock. It was his opinion that the accident of May 25, 1969 was a producing cause, or a contributing cause of Rivas' death. He concurred with Dr. Caballero's opinion that a stone in the cystic duct will not cause jaundice. He explained the basis of his opinion. Dr. Cuellar verified that Rivas gave a history of having been a heavy drinker in the past but Rivas said he recently only had one or two beers a day. He further testified that at some point in the hospitalization they wanted to get Rivas out of the hospital, that his fractures were recuperating, and that he was up and around and they were planning to send him home. He also stated that they could not send Rivas home because of the jaundice. He stated, "He was not ill from the fracture but from something that was going on in his liver or in his gall bladder." The appellant's major contention throughout the trial was that because of the fractures sustained in the fall an additional load was placed on the liver which accelerated its decompensation. Dr. Cuellar was asked questions of this nature on direct examination and then was asked, "Does this process put any strain on the liver?" to which he replied, "Not necessarily. It can cause a little bit of jaundice, and sometimes you don't even notice it, but it can." He conceded, as did the other doctors, that Rivas probably had cirrhosis of the liver prior to the fall on May 25, 1969. Regarding the progress made by Rivas while hospitalized, the doctor testified that he was placed on a regular diet and that the notes indicated he had a good appetite. Also on July 5th he was up walking without crutches and the

doctor testified that the skull fracture had resolved itself and the fracture of the pelvis was progressing. The doctor also testified that Rivas' bilirubin count in about three weeks had become almost normal. He also testified that he could not say whether the liver sustained any permanent damage as a result of the fall. He stated that a liver does have the power to regenerate but an unhealthy one does this very slowly. He said that the liver can get to the state where it is not capable of repairing any more, and in this case that Rivas lapsed into a coma from which he did not recover. In reviewing the records he also stated that on July 21st, 1969, Rivas again had a higher than normal bilirubin count and he was still jaundiced. He thought that the jaundice was caused by a liver that was not able to clear itself because it was scarred. He further testified that it was probable that damage was done to the liver as a result of the gall bladder operation. He also testified that Rivas' fever was caused by the gall bladder being extended and infected because of stones and that the fractures and fall that he sustained did not cause the stones. He also said that he didn't know the condition of Rivas' liver prior to the fall and if in fact the shock of the fractures were superimposed on the cirrhosised liver he doesn't know why no signs of this appeared on May 26th, 1969.

Special Issue No. 1 (the only issue submitted to the jury herein) reads as follows:

"Do you find from a preponderance of the evidence that the injuries sustained by Nicolas Beltran Rivas on May 25th, 1969, were a producing cause of the death of said Nicholas Beltran Rivas on August 1st, 1969?"

The jury answered that issue "No." In connection with that issue the trial court submitted the following definition:

"By the term 'producing cause' as used in this charge is meant an efficient, exciting, or contributing cause which in a natural and continuous sequence produces death. There may be more than one producing cause of a death."

An analysis of the medical testimony in this case reflects that there was considerable evidence, some given on direct examination of the doctors but mostly developed on cross-examination, which tended to negative a causal connection between the injuries sustained by Mr. Rivas on May 25, 1969 and his death on August 1, 1969, some 68 days later. The jury was authorized to believe and find that Mr. Rivas had a severely diseased liver and was suffering from a gall stone prior to the accident in question. The bilirubin count and the conditions observed during the operation on Mr. Rivas tended to show the existence of conditions not directly related to the accident in question. There was medical testimony to the effect that trauma does not cause gall stones and that the liver of Mr. Rivas received no direct trauma or permanent damage. According to the testimony the gall bladder operation on Mr. Rivas was quite traumatic in nature. There was obviously a lack of direct information and knowledge concerning Mr. Rivas' physical condition prior to the accident and there was evidence to the effect that his stay in the hospital might have increased his life expectancy, and that the immediate injuries from the accident of May 25, 1969 had cleared up or had progressed in that direction.

■ It is well settled that opinion evidence of a medical witness is not binding on the triers of fact and is not conclusive as to the opinions or theories presented by such class of evidence. Hood v. Texas Indemnity Ins. Co., 146 Tex. 522, 209 S.W.2d 345 (1948); Broussard v. Moon, 431 S.W.2d 534 (Tex.Sup., 1968). Part of appellant's argument under her point one is to the effect that in some cases opinion evidence is necessary and may in exceptional cases be conclusive. Two of the cases relied on in this connection are Insurance Company of North America v. Myers, 411 S.W.2d 710, (Tex.Sup.1966)

255

and Gulf Casualty Company v. Hughes, 230 S.W.2d 293 (Tex.Civ.App., Beaumont, 1950, n. w. h.). We do not believe that the holdings in such cases are helpful to appellant in the situation presented here. Appellant presented opinion evidence in this case legally sufficient to raise a fact issue as to whether the injuries sustained by Mr. Rivas on May 25, 1969 were a producing cause of his death on August 1, 1969. However, that evidence did not establish producing cause conclusively and the jury in its fact-finding function was free to accept or reject all or part of such testimony. Appellant's complaint here, under point one, concerns the *refusal* of the jury to find that the injuries sustained by Mr. Rivas were a producing cause of his death. Appellant says that the jury answer was against the great weight and preponderance of the evidence and that a new trial should be ordered. We overrule that contention. In arriving at our conclusion we have considered all of the evidence, as we are required to do under the contention made. See In Re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1952). The jury was authorized to find as it did in this case from the evidence presented. Appellant's point one is overruled.

Under point number two, appellant contends that the trial court erred in refusing to submit to the jury her requested definition of "injuries" reading as follows:

"You are instructed that the term 'IN-JURIES', as used in this charge, shall be considered to mean damage or harm to the physical structure of the body and such diseases and infections as naturally result therefrom, or the excitement, acceleration, or aggravation of any disease previously existing by reason of such damage or harm to the body."

We agree with appellee that appellant's request for that definition was properly refused because the fact of injury was not in dispute and the definition of producing cause submitted to the jury was sufficient to appraise it of all elements necessary to reach a verdict.

The parties stipulated that on May 25, 1969, Mr. Rivas sustained an accidental injury within the scope of his employment. Therefore, there was no necessity or request to submit a specific special issue concerning that fact. This is not a case wherein there is a dispute as to the injury, and the court improperly refuses to submit a definition of injury., See Commercial Standard Ins. Co. v. Noack, 62 S.W.2d 72 (Tex.Com.App., 1933, holdings approved).

It has been held in several cases that when it appears without dispute that the claimant sustained injury it is not necessary to submit a definition of the term. See Southern Underwriters v. Wheeler, 132 Tex. 350, 123 S.W.2d 340 (1939); Cottrell v. Texas Employers' Insurance Association, 293 S.W.2d 219 (Tex.Civ.App., San Antonio, 1956, wr. ref. n. r. e.); Fidelity & Casualty Co. of New York v. Branton, 70 S.W.2d 780 (Tex.Civ.App., Beaumont, 1934, wr. dism.); Traders & General Ins. Co. v. Mills, 108 S.W.2d 219 (Tex.Civ.App., Beaumont, 1937, wr. dism.). Appellant's argument under her point two is largely answered by the opinion in Cottrell v. Texas Employers' Insurance Association, supra. In that case the definition of "producing cause" was somewhat broader than in the instant case; but we are not here concerned with an objection to that term as submitted by the trial court. *Cottrell* is closely in point on the facts and the contention made here, and squarely holds that it was unnecessary to define "injury", where that fact was not in issue. Appellant's point two is overruled.

The judgment of the trial court is affirmed.